NOTICE

Decision filed 04/09/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200102-U

NO. 5-20-0102

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| CATHY J. JEFTS and DUANE R. JEFTS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 17-L-18 |
| | ) | |
| MENARD, INC., a Wisconsin Corporation; | ) | |
| EFFINGHAM ASPHALT CO., an Illinois | ) | |
| Corporation; CARL RHODES CONSTRUCTION, | ) | |
| INC.; and C.L. RHODES CONSTRUCTION, INC., | ) | |
| Individually and as C.L. Rhodes Concrete | ) | |
| Construction, a Sole Proprietorship, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Menard, Inc., a Wisconsin Corporation, | ) | Michael D. McHaney, |
| Defendant-Appellee). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court did not err in granting summary judgment in favor of defendant retail store where plaintiff failed to show the existence of a genuine issue as to any material fact regarding the open and obvious nature of a condition in defendant's parking lot, or any exceptions to the open and obvious rule.

1

¶ 2     The plaintiffs, Cathy J. Jefts and Duane R. Jefts,[1] brought an action against defendants, Menard, Inc., Effingham Asphalt Co., Carl Rhodes Construction, Inc.,[2] and C.L. Rhodes Construction, Inc., individually and as C.L. Rhodes Concrete Construction, a sole proprietorship (collectively Rhodes), seeking damages for injuries that plaintiff Cathy Jefts sustained after tripping on dislodged asphalt filler in a Menard's parking lot in Effingham, Illinois. Defendant Menard moved for summary judgment and argued that it owed no duty to the plaintiff because the condition in its parking lot was open and obvious and did not create an unreasonable risk of harm to its customers, and because it had no notice of the condition. The trial court granted summary judgment in favor of defendant Menard, Inc., and the plaintiff appealed. On appeal, the plaintiff claims that the trial court erred in entering summary judgment for Menard because there were genuine issues of material fact regarding whether the condition in Menard's parking lot presented an unreasonable risk of harm to customers, whether the condition was open and obvious, and whether Menard had notice of the condition. For reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On the morning of Sunday, August 30, 2015, the plaintiff drove her mother to a Menard store in Effingham, Illinois, to look at samples of roofing shingles. While in the store, the plaintiff's mother, then 90 years old, used a shopping cart to assist her with

---

[1]Duane Jefts was not involved in the accident, and his action against the defendants is based on loss of consortium. For clarity, we will refer only to plaintiff in the singular form for the remainder of the order.

[2]Defendant Carl Rhodes Construction was not a named defendant in the plaintiff's fourth amended complaint.

walking. After viewing the shingle samples, the plaintiff helped her mother back to the car and then returned the shopping cart to a nearby cart corral. After depositing the cart into the car corral, the plaintiff turned and took a step toward the car. As she stepped forward, she tripped and fell to the ground. After the plaintiff gathered herself, she noticed "some bubbled repaired asphalt that was raised uneven to the pavement." The plaintiff was helped into the store by another customer, and she reported the incident to an assistant manager.

¶ 5 On June 9, 2017, the plaintiff filed a complaint against the defendants, Menard, Inc., Effingham Asphalt Co., and C.L. Rhodes Construction Inc., individually and as C.L. Rhodes Concrete Construction, a sole proprietorship, alleging that the plaintiff was injured because of the defendants' failure to maintain the Menard parking lot. In the fourth amended complaint, which is the version upon which summary judgment was granted, the plaintiff alleged that Menard failed to maintain its premises and grounds in a reasonably safe condition for use by the plaintiff and other customers, failed to repair or remove dislodged asphalt and other debris in the area around the cart corral, and failed to warn plaintiff of the dislodged asphalt and debris in the area around the cart corral. The plaintiff also alleged that Menard constructed or oversaw the repair of the asphalt, and by and through its agents negligently repaired the cracks in the area around the cart corral. The plaintiff brought additional counts against Effingham Asphalt and Rhodes, and alleged that Menard contracted with Effingham Asphalt and Rhodes to repair cracks in its parking lot, and that Rhodes and Effingham Asphalt were negligent in repairing cracks in the parking lot near the cart corral where the plaintiff fell.

3

¶ 6    Defendants Effingham Asphalt and Rhodes each filed an answer to the fourth amended complaint, denying the allegations of negligence, and raising an affirmative defense based on comparative fault. Menard also filed an answer to the fourth amended complaint, denying the allegations of negligence, and raising affirmative defenses alleging comparative fault and asserting that the condition in its parking lot was open and obvious to its patrons.

¶ 7    Following a period for discovery, Rhodes filed a motion for motion for summary judgment, arguing that the plaintiff could not meet her burden to establish that Rhodes was responsible for repairing the crack near the cart corral where the plaintiff fell, and thereby creating the condition that caused the plaintiff to trip and fall. Rhodes attached several documents in support of its motion, including the depositions of the plaintiff, Greg Kabbes, the vice president of Effingham Asphalt, and Tony Etherton, a supervisor at Rhodes. Effingham Asphalt filed a separate motion for summary judgment, adopting Rhodes' motion for summary judgment in its entirety.

¶ 8    Menard also filed a motion for summary judgment. In its motion, Menard claimed that it was entitled to a judgment as a matter of law because the plaintiff could not prove the essential elements of her premises liability claim. Menard argued that the dislodged asphalt crack filler and crack in its parking lot did not present an unreasonable risk of harm to its customers because the defects were minor, were not hidden, and were able to be observed by ordinary persons. Menard also argued that the dislodged asphalt crack filler was an open and obvious condition, and that Menard reasonably expected that its customers would discover and appreciate the hazard and protect themselves against it. Menard further

4

argued that that it had no actual or constructive notice of the condition in its parking lot prior to the plaintiff's fall. Menard claimed that there were no prior incidents or complaints regarding that area of the parking lot and that the plaintiff offered no evidence to show how long that condition had been present in the parking lot. Menard attached documents in support of its motion, including the deposition of Cathy Jefts, the deposition of Danielle McKinney Niccum, an assistant manager at Menard, photos of the parking lot taken on the date of the incident by Niccum, and an affidavit of Christopher Jones, the general manager of Menard.

¶ 9   In the plaintiff's deposition, the plaintiff recounted the events leading to her fall at the Menard parking lot on August 30, 2015. She testified that she had accompanied her mother to the Menard store in Effingham to look at shingle samples. It was a sunny, dry morning, and visibility was not an issue. The plaintiff parked in a parking spot near the middle entrance to the store and obtained a shopping cart to assist her mother with walking. After looking at shingle samples, the plaintiff helped her mother back to the car and then returned the shopping cart to a nearby cart corral. The cart corral was in the same aisle as the plaintiff's parking spot, but it was beyond the car and away from the store entrance. The plaintiff testified that she scanned the area in front of her as she pushed the cart toward the corral. At that time, the parking area was not busy. The plaintiff did not encounter any other pedestrians or vehicles as she pushed the cart toward the cart corral. She did not see the bubbled asphalt or any debris. As she pushed the cart toward the corral, she did not feel her feet encounter any bumps or debris, and she did not feel or hear the cart roll over any bumps or debris. After pushing the cart into the corral, the plaintiff turned back toward the

5

car and took one step with her right foot. As she took that step, something caught her right foot, and she tripped and fell to the ground. She injured her right knee, right wrist, and the right side of her forehead.

¶ 10    The plaintiff was helped to her feet by two other customers, Ron White and Steve Shoemaker. As she gathered herself, she noticed "some bubbled repaired asphalt that was raised uneven to the pavement." She described the bubbled asphalt as "kind of tacky and spongy." She noted that it was black in color, and that the surrounding pavement was gray. She estimated that it was two to three inches higher than the surrounding pavement. The plaintiff, assisted by Ron White, returned to the store and reported the incident to an assistant manager.

¶ 11    The plaintiff testified that she was wearing sandals and a "cross-body" purse. She was not carrying anything in her hands. She stated that the toe of her right sandal caught the bubbled asphalt. The plaintiff testified that nothing was blocking her view of the bubbled asphalt on the pavement before she tripped, but she did not see it until after she fell. She could not recall if she was looking toward the ground when she tripped. There were no pedestrians or vehicles in her way as she started back toward the car. She did not believe that anything had diverted her attention before she fell.

¶ 12    The plaintiff was shown a few photos that were taken within a short time after the incident by an assistant manager at Menard. After reviewing those photos, the plaintiff was unable to say with certainty that the bubbled asphalt crack filler depicted in the photos was the same bubbled asphalt on which she tripped, but she stated that it looked similar. The plaintiff noted that the photos were close-ups and that they did not provide a larger

perspective of the parking lot in relation to the cart corral or the store entrance. The plaintiff did not know how long the parking lot had been in that condition or what caused the asphalt crack filler to lift out of the crack. She had no information to indicate that Menard knew of the dislodged crack filler.

¶ 13   Danielle McKinney Niccum, an assistant manager at Menard, was working on the day that the plaintiff fell. Niccum testified that she prepared an incident report regarding the fall. She then went out to the parking lot to take photos of the area where she believed the plaintiff had fallen. Niccum could not recall whether someone had shown her where the fall occurred or whether she determined the location based upon information provided by the plaintiff. Niccum looked near a cart corral and observed that the asphalt crack filler material had lifted out of a crack in the pavement. She took three photos of the area. Niccum notified the store's general manager, Wayne Thomas, of the incident. Thomas walked out to the parking lot and used a shovel to remove the dislodged crack filler. Niccum picked up a piece of the filler and noted that it was tacky, but that it did not leave residue on her hand. Niccum did not recall any receiving any reports about injuries or complaints about debris or dangerous conditions in the Menard parking lot prior to the plaintiff's fall.

¶ 14   In his affidavit, Christopher Jones stated that he was appointed as the general manager of the Menard store in Effingham in 2008. Jones averred that in each year since his appointment, Menard hired an independent contractor to assess the condition of its parking lot and perform necessary repairs. Jones further averred that the contractor was not

7

required to route[3] each crack prior to filling it. The contractor was expected to repair significant cracks pursuant to the contractor's expertise and judgment. Jones noted that an assistant manager, Danielle McKinney Niccum, took photos of the area where she believed Cathy Jefts had fallen. After viewing the photos, Jones offered his observation that the crack depicted in the photos appeared to be very small in size and shallow in depth, that the asphalt filler was next to the crack rather than inside it, and that it "appeared the filler had somehow been lifted out of the crack, perhaps by a patron's tire."

¶ 15    Jones stated that in the seven years prior to this incident, he "did routinely view the parking lot to determine whether unsafe cracks or defects were present," and that at no time did he ever observe "a significant crack or a crack which had the filler 'lifted out' of the crack by a person's tire or some other method." He further stated that in the seven years prior to the incident, Menard had not received any information or complaints regarding unsafe conditions in the parking lot or persons falling or tripping in the parking lot. Jones acknowledged that there were multiple cracks in the parking lot. He averred that cracks were a "usual condition of a parking lot" and that the cracks in the photos were "not concealed in any way." He further averred that parking lots develop cracks, especially in the Midwest, and that "it would not be practical or feasible to keep the parking lot free from all cracks."

---

[3]As explained during the deposition testimony of Tony Etherton and Greg Kabbes, crack routing is a process in which a saw blade cuts along the crack's edges to widen the crack and create clean edges along the length of the crack. The crack is blown clean and then filled flush with the surrounding asphalt pavement.

¶ 16    Tony Etherton was employed by Rhodes and handled the day-to-day affairs of that business. Etherton testified that in May 2015, Rhodes entered into a contract[4] with Menard to perform some maintenance work on the Menard parking lot. Rhodes then subcontracted the project to Effingham Asphalt, and Rhodes oversaw the work as a manager. Etherton stated that he provided oversight on the project to ensure the work was done according to specifications in the contract. Etherton testified that the project included concrete repair around storm drain collars, asphalt repair, and crack filling. Per Menard's specifications, cracks were to be routed, filled, and sealed. He stated that in general, companies do not repair cracks less than a quarter-inch wide. In preparing an estimate for the work, Etherton assessed the parking lot. He found that the south end of the parking lot, near the garden center entrance, was overall in pretty good shape. Etherton testified that Effingham Asphalt began work on June 10, 2015, and completed its work on July 16, 2015. Etherton was not on site every day that work was performed. He observed Effingham Asphalt filling cracks in the parking lot on three different days during the course of the project. At those times, he observed that the crew was routing the cracks before filling them. Etherton did a final walk-through with Menard general manager Chris Jones on July 22, 2015, and the work was approved.

¶ 17    Sometime after the plaintiff's fall, Etherton and Greg Kabbes, a representative from Effingham Asphalt, and their respective counsel, went to the Menard parking lot and were shown the area where the plaintiff was thought to have fallen. Etherton testified that he did

---

[4]The contract documents and specifications were not included in the record on appeal.

9

not believe that Effingham Asphalt filled any cracks in the area where the plaintiff fell. He did not recall any crack-filling work being done in that area. He knew of no documents which would show the specific areas where crack filling occurred during that project.

¶ 18 Etherton viewed the photos of the displaced crack filler taken on the day of the incident, after the plaintiff's fall. He stated that he did not observe the crack and the displaced crack filler depicted in the photos during his initial assessment in May 2015 or during his final walk-through on July 22, 2015. Etherton noted that the crack in the photos had jagged edges, rather than straight lines. Based upon the photos, he concluded that the crack had not been routed before it was filled. Etherton stated that the filler material appeared to be a "hot rubber applied" crack filler. He stated that in his experience, crack filler can be peeled up by a snowplow or by a car tire. He could offer no opinion regarding when the crack filler had been pulled up from the crack or how long that condition existed in the parking lot. Etherton testified that Rhodes had no responsibility for maintenance or repair of the Menard parking lot beyond the repairs contracted for in the summer of 2015. He stated that Menard had accepted bids from other contractors to repair its parking lot in years prior to 2015.

¶ 19 Greg Kabbes was the vice president and secretary of Effingham Asphalt. He was responsible for bidding on jobs and the oversight of projects. Kabbes testified that in May 2015, Rhodes emailed Effingham Asphalt and asked them to submit a bid for the Menard parking lot project. The email indicated that the project included 12,450 lineal feet of crack filling, but the lineal feet were not broken down by location. The project specifications also required cracks to be routed and then filled. Kabbes testified that Effingham Asphalt

10

personnel decided which cracks needed to be filled. Effingham Asphalt's employees "typically walk the parking lot and start filling cracks until they get to "the lineal foot of crack that we're supposed to be at." He clarified that if he or his crew found additional cracks that needed to be repaired, they would notify the contractor. Kabbes explained that crews generally begin with cracks at the front of the building because most of the foot traffic is in that location, and they work their way to the back of the parking lot. Kabbes testified that Effingham Asphalt's practice was to route cracks before filling them, and typically, they would not fill cracks without routing them. Kabbes noted that some cracks are too small to fill and are left alone. Under industry standards, cracks that are one-half to three-quarters of an inch wide are routed and filled. Kabbes estimated that his crew spent a couple of weeks routing and filling cracks on the parking lot. He stated there were no documents or photographs showing which specific cracks Effingham Asphalt repaired on that project in the summer of 2015. Kabbes did not know the location in the parking lot where the plaintiff fell. He could not say whether the plaintiff fell in an area where Effingham Asphalt had done work that summer.

¶ 20    Kabbes was shown photos of the subject crack and dislodged crack filler that were taken after plaintiff's fall. Kabbes did not believe Effingham Asphalt repaired the crack depicted in the photos because the crack had not been routed before it was filled, and the filler material bubbled and spewed out of the outside edges of the crack. Kabbes stated that the crack repair depicted in the photos was not typical of his company's work. He explained that when a crack is routed, a three-quarter-inch saw blade is run along the edges of a crack, leaving a clean edge, and the crack filler does not "cup out." A compressor is used to blow

debris and dust out of the crack, and the crack is filled. Kabbes testified that he followed his crews as they completed their work on the Menard project. He never saw anything that resembled the crack and the dislodged filler material depicted in the photos. Kabbes recalled that Effingham Asphalt had done some patching in the Menard's parking lot prior to 2015, but he did not recall doing any crack filling.

¶ 21    Kabbes testified that sometime prior to May 2015, he talked with Menard's manager, Chris Jones, about routing and filling cracks in the Menard's parking lot. Kabbes told Jones that some companies who filled cracks in the lot in prior years did not route them. He explained that when cracks are not routed, the filler can come loose. He recalled that Jones indicated it was a lot more expensive to route and fill cracks. Kabbes acknowledged that he had this conversation while he was trying to get Menard's business. Kabbes testified that Effingham Asphalt performed the original construction of the Menard parking lot. He did not recall any problems with the work or the materials used during the original construction. He further testified that Effingham Asphalt did not have an ongoing contract to maintain or repair the Menard parking lot.

¶ 22    The plaintiff filed a response in opposition to the defendants' motions for summary judgment and a motion for partial summary judgment. The plaintiff argued that Menard had a duty to maintain its parking lot in a reasonably safe condition for its customers and patrons, and that the other defendants had a duty to properly repair the parking lot. She asserted that the testimony in the record demonstrated that the dangerous condition in the parking lot was created by the negligence of the defendants and that the condition was ignored due to the costs associated with routing and filling cracks. The plaintiff argued that

the dangerous condition in the parking lot was not open and obvious. She also argued that she was not required to establish notice because the dislodged asphalt filler was akin to a foreign substance that was on the premises due to the negligence of Menard. The plaintiff asserted that Menard had notice that the asphalt filler could come loose and was an accident waiting to happen. She pointed to the testimony of Greg Kabbes regarding his conversation with the Menard's general manager sometime prior to 2015, to support her argument. Supporting documents were not attached to the motion, but plaintiff stated: "In accordance with the applicable standard of review, all depositions, pleadings and admissions are incorporated herein for support of this pleading."

¶ 23    All motions for summary judgment were called for hearing on December 12, 2019. During the hearing, the trial court questioned the parties about whether the dislodged crack filler was open and obvious and whether Menard had notice of the condition. After considering the responses and arguments of the parties, the court denied the plaintiff's partial motion for summary judgment and granted Menard's motion for summary judgment. The trial court did not offer its reasons for granting summary judgment in favor of Menard. The motions for summary judgment filed by Rhodes and Effingham Asphalt were taken under advisement. In a docket entry made later that day, the court denied those motions, noting that the plaintiff's claims against Rhodes and Effingham Asphalt were "hanging by a gossamer thread." Shortly thereafter, the plaintiff settled her claims with Rhodes and Effingham Asphalt. Upon motions by Rhodes and Effingham Asphalt, the court found that the settlements were made in good faith and dismissed with prejudice all claims against the settling defendants. This appeal followed.

13

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, the plaintiff contends that the trial court erred in entering summary judgment in favor of Menard. The plaintiff argues that the trial court improperly applied a notice requirement and failed to consider evidence that the offending condition was created and placed on the premises through Menard's own conduct. The plaintiff also claims that the trial court failed to consider evidence that the offending condition presented an unreasonable risk of harm and that it was not reasonably discoverable or open and obvious. In response, Menard contends that the plaintiff failed to present evidence to establish that the condition presented an unreasonable risk of harm, that Menard had notice of the condition, and that the condition was not reasonably discoverable.

¶ 26    Summary judgment is appropriate only where the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). The purpose of summary judgment is not to try a question of fact, but rather to determine if one exists. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162 (2007). A plaintiff is not required to prove her case at the summary judgment stage, but to survive a motion for summary judgment, the plaintiff must present a factual basis that would arguably entitle him or her to a judgment. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12. In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the nonmoving party. *Bagent*, 224 Ill. 2d at 163. The trial court's ruling on a summary judgment motion is reviewed *de novo*. *Bruns*, 2014 IL

116998, ¶ 13. An appellate court reviews the trial court's judgment, not its reasoning, and it may affirm the decision of the trial court on any grounds that are called for by the record. *City of Chicago v. Holland*, 206 Ill. 2d 480, 491-92 (2003).

¶ 27    To prevail on a claim of negligence, a plaintiff must establish the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990). Whether a defendant owes a duty of care to a plaintiff in a particular case is a question of law for the court to decide. *Ward*, 136 Ill. 2d at 140. A court will consider whether a plaintiff and a defendant stood in such a relationship that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 18. In determining whether a duty exists, a court will consider the reasonable foreseeability of injury, the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant. *Simpkins*, 2012 IL 110662, ¶ 18. The weight given to each of these factors depends on the individual circumstances of the case. *Simpkins*, 2012 IL 110662, ¶ 18.

¶ 28    In this case, the relationship between Menard and the plaintiff was that of a property owner and a customer. Generally, a party that owns, controls, or maintains property has a duty to maintain its premises in a reasonably safe condition for its customers. *Ward*, 136 Ill. 2d at 141. If there is a dangerous condition on the premises, the property owner must either correct or remove that condition or warn its customers of the danger. *Ward*, 136 Ill. 2d at 141-42. However, under the principles of common law, a property owner is not

15

required "to foresee and protect against an injury if the potentially dangerous condition is open and obvious." (Internal quotation marks omitted.) *Bruns*, 2014 IL 116998, ¶ 16.

¶ 29 Illinois has adopted the rules set forth in sections 343 and 343A of the Restatement (Second) of Torts regarding the duty of possessors of land to their invitees. *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 434 (1990). Section 343 of the Restatement provides:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger."

Restatement (Second) of Torts § 343, at 215-16 (1965).

¶ 30 Section 343A of the Restatement provides the following exception to section 343:

"A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." Restatement (Second) of Torts § 343A(1), at 218 (1965).

¶ 31 According to the Restatement, an "obvious" danger is one in which "both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception, intelligence, and judgment."

16

Restatement (Second) of Torts § 343A, cmt. b, at 219 (1965). The rationale underlying this rule is that the law generally assumes that persons who encounter open and obvious hazardous conditions will exercise reasonable care for their own safety and protect themselves from risks posed by the dangerous condition. *Ward*, 136 Ill. 2d at 148. The open and obvious nature of the condition itself gives caution, and therefore, the risk of harm is slight as people are expected to appreciate and avoid obvious risks. *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 448 (1996). The question of whether a condition is obvious is determined by the objective knowledge of a reasonable person, not the plaintiff's subjective knowledge. *Deibert*, 141 Ill. 2d at 434-35; *Wade v. Wal-Mart Stores, Inc.*, 2015 IL App (4th) 141067, ¶ 22.

¶ 32    The open and obvious rule is not confined to common and apparent hazards posed by fire, heights, or bodies of water, and may apply to other conditions that reasonable people would recognize as dangerous. See *Bruns*, 2014 IL 116998, ¶ 17 (and cases cited therein); *Ward*, 136 Ill. 2d at 152. Whether a dangerous condition is open and obvious may present a question of fact. *Bruns*, 2014 IL 116998, ¶ 18. However, when there is no dispute as to the physical nature of the condition, whether the dangerous condition is open and obvious is a question of law. *Bruns*, 2014 IL 116998, ¶ 18.

¶ 33    Here, it is undisputed that the plaintiff tripped on dislodged asphalt crack filler near a cart corral in the Menard parking lot. The physical characteristics of the dislodged crack filler were not in dispute. The plaintiff testified that the dislodged crack filler material was bubbled up and raised two to three inches above the surrounding surface of the parking lot. She described the filler material as black in color, while the parking lot pavement was gray.

Additionally, photos were taken in the area of the parking lot where the plaintiff was thought to have fallen. Although the plaintiff could not state with certainty that the photos depicted the filler material on which she tripped, she testified that it looked similar. The photocopies in the record show that the dislodged crack filler material was raised above the level of the surrounding pavement. There was a discernable contrast between the crack filler material and the pavement. The dislodged material was visible. It was not obscured by the cart corral, and it appears there was adequate space to step around it.

¶ 34    The plaintiff testified that this incident occurred on a dry, sunny day in August. The plaintiff stated that although she did not notice the dislodged crack filler material before her fall, she saw it immediately after her fall. The plaintiff acknowledged that her walking path and her view of the parking lot was not obstructed by other customers or cars, and she was not carrying anything in her hands. Thus, the plaintiff was unable to explain why she could not have seen the displaced filler material and thus avoided the hazard. The plaintiff did not claim that she was actually distracted by anything prior to her fall. This does not appear to be a case where some circumstance was present that required the plaintiff to divert her attention from an open and obvious danger or otherwise prevented her from avoiding the risk. See, *e.g.*, *Deibert*, 141 Ill. 2d 439-40 (plaintiff fell in a rut outside restroom on construction site while looking up to ensure that coworkers were not discarding debris from a balcony above him); *Ward*, 136 Ill. 2d at 153-54 (customer carrying bulky merchandise collided with five-foot-tall concrete pillar outside store exit).

¶ 35    Based on the specific circumstances of this case, as demonstrated by the pleadings, depositions, affidavits, and photo exhibits, the dislodged crack filler was an open and

obvious condition, and the plaintiff failed to allege or establish that any exception to the open and obvious rule applied. That, however, does not end our inquiry as to whether the premises owner owed the plaintiff a duty of care. We must next consider the following four factors in assessing whether a duty was owed: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Simpkins*, 2012 IL 110662, ¶ 18.

¶ 36    The first two factors carry little weight in this case. When a condition is open and obvious, the defendant is not typically required to foresee injury. *Bruns*, 2014 IL 116998, ¶ 35. Additionally, if a condition is open and obvious, the reasonable likelihood of injury is slight because the law presumes that people will appreciate and avoid the dangerous condition. *Bruns*, 2014 IL 116998, ¶ 35. With respect to the final two factors, the record contains no specific evidence as to the burden, financial or otherwise, of guarding against the injury, or the consequences of placing that burden on the defendant. It is often the case that parties completely ignore or otherwise fail to develop a record on the final two factors even though they are entitled to weight (*Simpkins*, 2012 IL 110662, ¶ 18) and could conceivably tip the balance in the duty analysis. Here, the factors involving the burden of guarding against injury and the consequences of placing that burden on the property owner were not addressed or developed in the record, and the plaintiff did not establish that Menard had a duty to protect her from the condition in its parking lot.

¶ 37                                    III. CONCLUSION

¶ 38     It bears repeating that the plaintiff was not required to prove her case to withstand Menard's motion for summary judgment, but she was required to present a sufficient factual basis that would arguably entitle her to relief. After reviewing the record and the arguments of the parties, we find that there were no genuine issues as to any material fact, and the plaintiff failed to satisfy her burden to establish that Menard owed her a duty under the specific facts and circumstances presented in this case. Because our resolution of the duty issue is dispositive, we need not address the plaintiff's remaining arguments.

¶ 39     Accordingly, the judgment of the circuit court is affirmed.


¶ 40     Affirmed.